In the Matter of LEMAN B. TREADWELL, an Attorney,
Respondent.

In the Matter of RICHARD W. DARLING, an Attorney,
Respondent.

First Department, December 29, 1916.

Attorney at law — unprofessional conduct — employment of disbarred
attorney as interpreter.

Proceeding to discipline attorneys at law upon the charge that they had
allowed a disbarred attorney to practice law in their names and in their
offices.  Respondents contended that they had merely employed the
disbarred attorney as an interpreter to aid them in dealing with clients
who were unable to speak the English language.  It appeared that the
attorneys allowed advertisements in the foreign language to be printed
in which the name of the disbarred attorney appeared as being con-
nected with their office and that they had moved to premises occupied
by the disbarred attorney.  Evidence examined, and *held*, that while
the charge against the respondents was not proved, their conduct called
for the disapproval of the court.

DISCIPLINARY proceedings by the Association of the Bar of
the City of New York.

*Einar Chrystie*, for the petitioner.

*Leman B. Treadwell* and *Richard W. Darling*, respondents,
in person.

CLARKE, P. J.:

The separate petitions filed against the respondents, differing
only as to their names, charged them, in substance, with allowing
one Francis J. Nekarda, a disbarred attorney, to practice law in
their names and in their offices.  The respondents, in their respec-
tive answers, alleged that the only relations existing between
themselves and Nekarda were that they employed him as an
interpreter; that he had no interest whatever in any litigation
conducted by them, and, so far as they knew, conducted no liti-
gations on his own behalf.  Both proceedings were referred to the
same official referee, and the evidence taken before him was, upon
consent of all parties, received as against both respondents.

The respondent Treadwell was admitted to the bar in
November, 1878; the respondent Darling in November, 1879.
For over fifteen years prior to the hearings had before the official

referee the respondents, while never partners, shared offices
and were associated together in many litigations. In 1906 one
Francis J. Nekarda, an attorney, was disbarred by this court
(*Matter of Nekarda*, 114 App. Div. 370), the said order of dis-
barment being subsequently affirmed by the Court of Appeals
(188 N. Y. 590). At the time of his disbarment Nekarda was
a member of the firm of Wheeler & Nekarda, which had offices
at 309 Broadway. After his disbarment Nekarda continued
to work in the same offices as clerk to Wheeler until the latter's
death in April, 1911. One Overlander, an attorney, subse-
quently moved into the offices in question, and Nekarda con-
tinued as a clerk in his employ.

The petition charges that in July, 1913, Nekarda procured
the respondents to move their offices from Nassau street to his
quarters at 309 Broadway, where they have since permitted
him to practice law in their names. The quarters referred to
are those successively occupied by Wheeler and. Overlander.
In September, 1912, a corporation known as the Auto Pneu-
matic Swimming Belt, Inc., was organized, which thereafter
was succeeded by the Auto Life Belt, Inc., and this company
secured a lease of the said offices at a rental of fifty dollars per
month. Nekarda and his wife were the principal stockholders
of the company and the respondent Treadwell was its president.
About July, 1913, the respondents, who were then occupying
offices at 106 Nassau street, moved into the offices leased by
the company. These offices consisted of three rooms, one of
which was occupied by the respondent Treadwell for his private
office, another by respondent Darling for the same purpose,
and the outer room by Nekarda for his own business affairs
and those of the company, as well as for a waiting room. The
names on the door leading to the suite read as follows:

"701
"L. B. Treadwell
"R. W. Darling
"Law Office

"Francis J. Nekarda
"Notary Public

"AUTO LIFE BELT, INC."

The Auto Life Belt, Inc., paid fifty dollars per month for the rental of the suite unfurnished, and the respondents paid the same amount for their offices furnished, together with the use of the outer office as a waiting room. According to Treadwell, it was arranged that the respondent should pay their monthly rental directly to the landlord, which arrangement continued down to the time of the hearings before the official referee. It thus appears that neither Nekarda nor the Auto Life Belt, Inc., made any payment to the landlord on account of rental for the suite.

The petition charges that the respondents, with knowledge of Nekarda's disbarment, permitted him to insert in newspapers published in the Slavic language in New York city an advertisement of which the following is a translation:

"Law Office
"L. B. Treadwell        R. W. Darling
"Counsellors
"Litigate pecuniary damages for countrymen in cases of injury and death.
"Conduct civil and criminal actions in the highest courts.
"Mr. F. J. Nekarda has connection with this office.
"Speak and write Slovak.
"309 Broadway        New York
"Telephone: 2797 Worth
"Residence        223 E. 69th St., N. Y.
"Telephone: 2793 Plaza."

It is not disputed that the above advertisement appeared in two Slavic newspapers published in New York city, the *Slovak v Amerike* and the *Slovensky Pokrok*. In respect to the advertisement in the *Slovak v Amerike*, the respondent Treadwell testified that one Orbach, an old friend and client who edited the same, solicited an advertisement from him, stating that Wheeler in his lifetime had carried one; that he gave Orbach one of his business cards, stating that he was willing to advertise to the extent of that card, and that his sole reason for so doing was to inform his Slavic clients of his change of address. Treadwell testified: "Now I never saw the advertisement, except I saw it once lying on the table, and I was

standing up, and I saw that my name was there, and that the balance was in a language that I did not understand; and so that is the only knowledge or acquaintance I had with it. I believed that Mr. Orbach, the editor of the paper, would publish my card and nothing more."

Orbach testified that the advertisement in question appeared in the *Slovak v Amerike* for about two years, whereas Treadwell estimated the period of publication as about six months. Orbach testified that when Treadwell consented to advertise, nothing was said as to the subject-matter of the advertisement; that Treadwell handed him his business card, and he told Treadwell he would continue the advertisement of respondents' predecessors, Wheeler and Overlander; that the bills for advertising were sent to the respondent each month, but that he never sent them a copy of the advertisement. The only evidence in respect to the advertisement in the *Slovensky Pokrok* was the testimony of Treadwell, to the effect that he consented that they carry an advertisement which he believed to be his business card only.

It seems scarcely credible that the subject-matter of the advertisements should not have come to the attention of the respondents. The merest glance at the advertisement would have revealed the fact that it contained Nekarda's name, home address and telephone number. It could hardly be mistaken for the respondents' business card, which read:

"Tel. 2797 Worth
"L. B. Treadwell
"Attorney and Counsellor
"309 Broadway,
"New York.
"Leman B. Treadwell
"Richard W. Darling."

Treadwell admitted that he had seen the advertisement in a newspaper on his table, but claimed to have taken no notice of its contents, assuming that Orbach had carried out his instructions. Giving full credit to the respondents' testimony, it does not, I think, excuse their permitting this advertisement to be published daily for the long period of time during which it was published. The ethics of professional advertising by lawyers

is in itself a subject of sufficient delicacy to require an attorney who resorts to that medium of increasing his practice to observe the utmost care in the subject-matter of advertising published in his name. An attorney who has enjoyed the benefits which he may assume have accrued to the respondents through the advertising in question should not be permitted to disclaim all knowledge of the subject-matter of his advertisement and all responsibility therefor.

Upon the demand of the respondents the petitioner served a bill of particulars containing "the names of the persons to whom Nekarda is alleged to have held himself out as an attorney, transacted legal business, brought actions and proceedings in courts," naming the following persons: Wellman, Gooch & Smyth; George Kalauz; Steve Oravecz; John Benyak; Ignatz Macek; Agnes Macek.

In September, 1913, the respondent Darling was the attorney for the plaintiff, and the firm of Wellman, Gooch & Smyth attorneys for the defendant, in a personal injury action brought by one John Martinkovics against the Lehigh Coal and Navigation Company. On September 11, 1913, Darling wrote to the defendant's attorneys a letter which began as follows: "Referring to the interview of our Mr. Nekarda yesterday with your Mr. Smyth with reference to the above case, in which a suggestion arose as to a possible adjustment of the same, I beg to submit the following facts for your consideration, which I believe will be conceded." In explanation of his reference to "our Mr. Nekarda," the respondent Darling testified that he had theretofore communicated with the defendant's attorneys by telephone with reference to a physical examination of the plaintiff and had notified them that Nekarda was a competent interpreter; that Nekarda called upon Mr. Smyth to see whether he would be satisfactory, and on his return reported that there was some talk of settlement and a desire to know for what amount the plaintiff would settle the case; that "I used the word 'our' as the interpreter for both the plaintiff and the defendant." Nekarda's testimony before the official referee was corroborative of that of the respondent Darling, whereas, before the grievance committee he testified that he called upon Smyth to serve a paper.

The Kalauz case.　Nekarda met Kalauz in Pennsylvania in 1912 and brought him to New York as a witness in the case of *Shandalla* v. *Lehigh Valley Coal Company*, prior to the removal of the respondents from Nassau street to 309 Broadway.　Kalauz had been injured in the same accident in which Shandalla was hurt.　After bringing him to New York as a witness Nekarda introduced him to the respondent Darling, and an action was brought in his behalf in which Darling appeared as attorney of record and the respondent Treadwell as counsel.

The Oravecz case.　Oravecz was injured in April, 1914, while in the employ of the Philadelphia and Realing Company in its mines in Pennsylvania.　Upon reading the advertisement of the respondents in the *Slovak v Amerike*, Oravecz wrote to Nekarda relative to the accident.　The following is a translation of Nekarda's reply to Oravecz, which was written on the respondents' letterhead, with the name Francis J. Nekarda, 309 Broadway, New York, impressed thereon with a rubber stamp:

"*October* 17, 1914.

" Mr. Stefan Oravecz:

"Dear Sir.— In reply to your letter I let you know I think that you have a very good case for a big claim against the respective company.　But you must give us more details as to how the accident happened to you.　Let us know through somebody replies to the following questions:

" (1) How *old* are you, *married* or *single ?*

" (2) The full name of the respective Railroad Company in English.　How is it written ?

" (3) What train was it, passenger or freight ?

" (4) In what direction did the train proceed; whence and where to ?

" (5) The exact place where it happened to you, whether by the *depot* (station) or at the *crossing ;* near what street or on the tracks ?

" (6) What was the *cause* of your failure to see or hear the train ?

" (7) How many tracks are there ?

" (8) Can you obtain a photograph (picture) of the place where it happened ?

"(9) For which company were you working at the time and where?

"(10) Whose fault and error was it that the train injured you?

"As soon as you have forwarded the replies and full explanations of all the questions we shall immediately get to work in your matter on a percentage basis and you will have no expenses whatsoever. The best would be if you could soon come over and furnish the detailed explanations of the questions.

"Respectfully and with greetings,

"F. J. NEKARDA,

"Slav Lawyer.

"Kindly hand our address also to every injured countryman in your vicinity."

A second letter to Oravecz, also on the stationery, of the respondents, and stamped with Nekarda's name as was the previous letter, read as follows:

"*October* 27, 1914.

"DEAR SIR.— I received your second letter this day and I understood everything fairly well, but you did not state whether you were *walking* or crossing along same (across same) street or road or walked *along* the *railroad tracks*, how far; *how many* feet away it was beyond the depot? Or was it necessary to walk in that direction or along the road? Or else did you ever walk there before or other persons? The best would be if you could have the place photographed and send us the picture. And still better if you could bring it to us early in person to New York and explain to us the entire happening by word of mouth. Awaiting your further reply, I remain          .          Respectfully and with greetings,

"FRANCIS J. NEKARDA.

"If there is another injured person in your neighborhood hand our address to him."

According to the testimony of the respondents and Nekarda the latter referred the letters from Oravecz to the respondent Treadwell, and the letters written in reply were written by Nekarda at Treadwell's direction. The letters were written in

Slavic, and the respondents denied any knowledge of the insertion of the postscripts by Nekarda. Nekarda was unable to explain the use of the words "Slav Lawyer" after his signature in the first letter, except that it had been his habit to sign his name in that way prior to his disbarment. Oravecz came to New York in November, 1914, and called at the office of the respondents. He was there interrogated by them concerning the accident, Nekarda acting as interpreter. The respondent Treadwell thereafter brought an action in his behalf, which action was still pending at the time of the hearing before the official referee.

The Benyak case. One Benyak was killed in February, 1913, while in the employ of the Lehigh Valley Coal and Navigation Company. Nekarda's correspondence with Maria Benyak, the mother of the decedent, began in May, 1913, while he was still in the office of Overlander. On July 25, 1913, after the respondents had succeeded Overlander in the offices at 309 Broadway, Nekarda wrote Maria Benyak on the respondents' letterhead, rubber-stamped with his name in the same manner as the letters above referred to:

"*July* 25, 1913.

"Mrs. MARIA BENYAK:

"DEAR MADAM.—I did not reply to your letter of the 18th of July for the reason that I was away from the City. As to the benefit that has nothing to do with the case. You may sue for that even from here. Right is the most important matter and it should not be postponed unnecessary. A witness may reside wherever he pleases as long as he remains true to you and truthful. It is understood that it would be the best if he were away from Lansford, so that the company should not know about him. So let us know what you will do in the matter and when we are to expect you. You must be prepared so as to stay and live here with your family until the time of the trial.

"Respectfully and with greetings,

"L. B. TREADWELL,

"Per F. J. NEKARDA.

"If there is anybody injured in your neighborhood give him our address on the quiet."

It appears that one John Benyak, the decedent's father, moved to New York in August, 1913. He first called upon Nekarda at his residence and then at 309 Broadway. Some time in September, 1913, he was introduced to the respondents by Nekarda, and signed a power of attorney to them to collect a benefit fund and a retainer with Treadwell to prosecute an action for the death of his son. Benyak settled his claim directly with the defendant company in August, 1915, and that respondent Treadwell and the trial counsel thereafter commenced an action against the Benyaks and the Lehigh Coal and Navigation Company for services in the action.

The Macek case. Ignatz Macek was injured in Pennsylvania in the year 1914, while in the employ of the Lehigh Coal and Navigation Company. Thereafter Macek received a letter from Nekarda, which Mrs. Macek testified was destroyed, in which Nekarda told the Maceks to come to New York, as they had a good case. The Macek family came to New York on an excursion on October 12, 1914, and called upon Nekarda at his residence. Mrs. Macek rented a room in One Hundred and Fifty-ninth street in The Bronx, and on October twenty-eighth the Macek family moved to New York. Mrs. Macek thereafter called upon Nekarda at 309 Broadway, at which time she saw the respondents, but did not talk to them. She stoutly maintained that Nekarda told her that he was her lawyer, but in November, 1914, her husband executed a retainer to the respondent Treadwell, who commenced an action on his behalf against the Lehigh Coal and Navigation Company. This action was likewise settled by the parties without the knowledge of Treadwell, and an action was thereafter brought by Treadwell and the trial counsel to recover for the amount of the fees to which they were entitled.

The record contains no evidence of the legal services performed by Nekarda in any of the actions enumerated above, nor of any moneys received by him, except small sums in payment for his services as interpreter. Nekarda testified: " There was no specific arrangement. There were no specific terms. I simply submitted to them items once a month or so, and asked them to pay me for whatever work I did for them." The respondents were unable to produce any book entries

showing amounts paid to Nekarda for his alleged services as interpreter, or Nekarda of amounts received by him.

The official referee in his report comments as follows: "The documentary testimony, consisting mainly of the foregoing letters and the use of the stamp, and the admissions of Nekarda as to what he did in connection with the business of the respondents with their Slav clients, certainly indicate that Nekarda took more than a natural and ordinary interest therein. The testimony shows that the witnesses in these proceedings who became clients of the respondents were first brought in touch with them through Nekarda. The proof, however, is that no money has been paid to Nekarda by the respondents for such service, and that he has not now and never did have any pecuniary interest, contingent or otherwise, in the outcome of the litigations of these clients."

There is a lack of positive and direct evidence as to the interest that Nekarda had in the litigations referred to. It is too much to ask this court to believe that they were purely altruistic. Negligence cases upon fifty per cent contingent retainers procured by his letters and his activities were taken by the respondents. The nature of the cases, the sources from whence they came, the character of the litigants, the familiarity with their language possessed by Nekarda, all lead to the reasonable inference that in so touting for respondents he was to receive benefit to himself.

When an attorney has been disbarred, he has been pronounced unfit for further professional activities. The respondents moved to the former office kept by Nekarda and permitted him to remain therein, and undoubtedly availed themselves of his services. To what extent further than what has been hereinbefore indicated is not shown. By the letters that he wrote to them in their name, stamping thereon his own name, signing some of them "Francis J. Nekarda, Slav Lawyer;" by the business he solicited and obtained, and the advertisements inserted, he has brought respondents under grave suspicion and caused the institution of this disciplinary proceeding. We cannot approve of the matters brought to our attention and hold the respondents blameless. We think, in view of the referee's report, which finds respondents guiltless

of the main charge made against them, that we should confine our action to this expression of disapproval.

McLAUGHLIN, SCOTT, DOWLING and SMITH, JJ., concurred.

Conduct of respondents disapproved.　Order to be settled on notice.